J. Ashlee Albies  OSB #051846
E-mail: ashlee@civilrightspdx.com
Michael Rose, OSB # 753221
E-mail: mrose@civilrightspdx.com
CREIGHTON & ROSE, PC
500 Yamhill Plaza Building
815 S.W. Second Avenue
Portland, Oregon  97204
Phone:   (503) 221-1792
Fax:     (503) 223-1516
Of Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

DANIEL HARRIGAN, by and through his
guardians CAROLE HARRIGAN and
RANDY HARRIGAN,

     Plaintiff,

  vs.

MARION COUNTY, et al.,

    Defendants.

Civil No. 6:11-CV-06174-SI

**PLAINTIFF'S TRIAL MEMO**

**TABLE OF CONTENTS**

I. INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.   FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.  LEGAL CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

CREIGHTON
& ROSE, PC | ATTORNEYS AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

A.    First Claim: 42 USC § 1983 – Fourth Amendment Claims
for Excessive Force Against  Individual Defendants  . . . . . . . . . . . . . . . . 7

B.    Second Claim: Battery against Marion County . . . . . . . . . . . . . . . . . . . . . 14

C.    Third Claim: 42 USC Section 1983 Claims – *Monell* Claim
against Marion County . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

D.    Fourth Claim: Harrigan's Claims under the ADA and the
Rehabilitation Act Against Marion County . . . . . . . . . . . . . . . . . . . . . . .   18

1.    Harrigan is a Qualified Individual Under the ADA and the Rehab
Act  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

2.    Both The ADA and the Rehab Act Prohibit Public Entities From
Discriminating in Providing Benefits, Services, Programs or
Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

3.    Harrigan was Discriminated Against "By Reason Of"
His Disability  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

4.    Defendants failed to accommodate Harrigan's Disability  . . . . . . . 24

E.    Abuse of a Vulnerable Person Against Marion County  . . . . . . . . . . . . . . 24

1.    Vulnerable persons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

2.    Physical abuse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

3.    Physical abuse of a vulnerable person  . . . . . . . . . . . . . . . . . . . . . . 28

IV.    DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CREIGHTON | ATTORNEYS
& ROSE, PC | AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

## I.    INTRODUCTION

On September 21, 2010, Daniel Harrigan, a 24-year-old man with severe autism,

epilepsy and developmental delays, was attacked and traumatized by members of the

Marion County Sheriff's Department.  Despite being informed of Mr. Harrigan's

condition, the deputies, rather than de-escalating the situation, chose to exacerbate matters

by yelling at Mr. Harrigan, shooting him with bean-bag bullets, and siccing their canine

unit ("dog") on him.  This resulted in a trip to the hospital for Mr. Harrigan, staples in his

leg, and lasting emotional trauma. Pursuant to 42 USC § 1983, Mr. Harrigan alleges

defendant deputies violated his Fourth Amendment rights by subjecting him to excessive

force resulting in substantial injury, and that defendant Marion County is also liable for

the constitutional deprivation. Mr. Harrigan further alleges that the defendant County

violated his rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §

12101, *et seq.*, and the Rehabilitation Act ("Rehab Act"), 29 USC §701, *et seq*. Mr.

Harrigan also brings pendent state law claims against defendant Marion County for Abuse

of a Vulnerable Person, pursuant to ORS 124.100, and Battery. He seeks awards of

economic damages, non-economic damages, attorney fees and litigation expenses/costs

against defendants.

## II.    FACTUAL BACKGROUND

Plaintiff will present evidence that on September 21, 2010, members of the Marion

County Sheriff's Department responded to a 911 call of injured staff members at a State

CREIGHTON & ROSE, PC | ATTORNEYS AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

Operated Community Program ("SOCP") Crisis home, Macleay House, in Salem, Oregon. Dispatch for the call relayed to the deputies that Daniel Harrigan, plaintiff in this case, was autistic and aggressive, and that he had a seizure disorder which prohibited the use of TASERs. The call relayed that two staff members were injured and needed medical aid, that Mr. Harrigan was contained in the home, and that other residents were secured.

The evidence will show that five deputies, including defendants Stacy Lucca, Jason Bernards and Jeffrey Stutrud, and one sergeant, T. Shane Burnham, responded to the call. Upon arriving at the scene, the deputies spent very little time gathering information about Mr. Harrigan from the staff members who knew him best. Mr. Harrigan was locked inside the "day room" of the home, pacing around. The deputies could clearly see into the room and monitor him through a very large shatterproof glass window. Within moments of arriving, they formulated a plan to have Deputy Stacy Lucca give Mr. Harrigan verbal commands, and if he did not comply, to enter the locked day room, deciding in advance to use escalating force, if he did not comply with their verbal commands.

Evidence will show that Mr. Harrigan, a resident of Macleay House, is severely autistic, has epilepsy and substantial developmental delays – his IQ is below 20, and he is essentially non-verbal. Consistent with individuals with autism, the more agitated Mr. Harrigan becomes, the more limited he is in receptive communication. Those who work with him have learned how to recognize escalating behavior, address it immediately, and

CREIGHTON & ROSE, PC | ATTORNEYS AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

to leave him alone to calm himself down. On the night of the incident, Mr. Harrigan had
an escalation of behavior due to untreated pain. Staff were directed to call 911 to get
medical attention for the injured staff.

Plaintiff will present evidence that Deputy Lucca had been trained in negotiation,
crisis intervention, and responding to people with autism. However, rather than attempt to
de-escalate the situation as she was trained to do, Deputy Lucca is expected to testify she
shouted commands at Mr. Harrigan to get on the ground through a locked door. When he
didn't sit down on the ground, Deputy Bernards broke the door down, and all six deputies
piled into the room, shouting various commands at him. Deputy Bernards shot him with
two rounds of bean-bags when Mr. Harrigan did not immediately get on the ground
and/or show his hands (he was holding a harmonica). Deputy Stutrud then launched his
dog, a Belgian malinois,
(http://livefromtherosecity.blogspot.com/2011/10/meet-k9-deputy-renzo.html) at Mr.
Harrigan. After the dog had attacked and while it was still biting Mr. Harrigan's leg,
Deputy Bernards shot Mr. Harrigan with another round of bean-bags. The deputies are
expected to testify that no warnings were given before each use of force, and that Mr.
Harrigan had made no attempts to escape nor made threatening moves or gestures before
the force was used.

The evidence will show the deputies' action resulted in puncture wounds and
bloody lacerations from the dog bite, which necessitated a trip to the hospital for Mr.

CREIGHTON | ATTORNEYS
& ROSE, PC | AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

Harrigan, and large contusions from the rubber bullets. Once at the hospital, where he was treated, the deputies chose to cite Mr. Harrigan with assault, and released him to the care of Macleay staff.

Plaintiff will present testimony from two expert witnesses. The first, John Ryan, is a retired police captain for the city of Newport, RI, and currently the co-director of the Legal and Liability Risk Management Institute. He will testify that, given the totality of the circumstances described above, the force used against Mr. Harrigan was unreasonable: it was wholly unnecessary and excessive in its application; that the way in which the officers developed and executed their plan for addressing Mr. Harrigan fell far below acceptable standards of police conduct; and that the policies and training given by Marion County was deficient, especially in light of what was known about addressing autistic and otherwise disabled subjects. The second, Genevieve Athens, will explain what Autism Spectrum Disorder is, how it manifests and how Mr. Harrigan fits into that milieu.

Daniel Harrigan will be unable to testify during this trial due to his disabilities; however, his parents will describe their impressions of Mr. Harrigan's behavior in the aftermath of this incident, and evidence will be presented on his injuries and medical expenses.

Plaintiff will also present evidence that in the aftermath of the incident the Marion County Sheriff's Department ratified and affirmed the conduct of its deputies, refused to

CREIGHTON & ROSE, PC | ATTORNEYS AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

conduct an autism training, and continues to refuse to do so, despite being aware of a

number of autistic members of the community. Evidence will show the Marion County

Sheriff's Department believes its deputies acted appropriately.[1]

## III.   LEGAL CLAIMS

### A.   First Claim: 42 USC § 1983 – Fourth Amendment Claims for Excessive Force Against Individual Defendants

The lesson to be derived from the last thirty years of Fourth Amendment

jurisprudence has been that the evaluation of the propriety of police conduct is dependent

upon the totality of the circumstances confronting the officer on the street. When all of

the relevant circumstances are considered, the force used upon Mr. Harrigan was clearly

excessive.

The Fourth Amendment prohibition of unreasonable searches and seizures requires

that, even though the *fact* of a seizure may be reasonable,[2] the manner of effecting the

---

[1] It is unclear how much of the facts are in dispute and the extent to which the need for some proof might be obviated through stipulation. Plaintiff's counsel has made numerous attempts to confer with opposing counsel regarding the parties' stipulation, including those regarding undisputed facts. Until noon on 19 August, Defendants' counsel had been unresponsive. Plaintiff's counsel found out during the lunch hour on 19 August that defendants have secured new counsel, Harrang, Gary, Long, Rudnick. As a result, as of 4:30 pm on the filing deadline, conferral has still not happened.

[2] Plaintiff was seized, for Fourth Amendment purposes, when he was confined in the locked day room and the day room surrounded by the defendant Sheriff's deputies. *See United States v. Al-Azzawy*, 784 F.2d 890, 892-3 (9th Cir. 1986) (suspect was effectively arrested while in his home when police surrounded his trailer with their weapons drawn and ordered him to leave the trailer and drop to his knees); *Fisher v. City of San Jose*, 558 F.3d 1069, 10745-5 (9th Cir. 2009) (under similar facts, plaintiff was seized inside his home); *Kaupp v. Texas*, 538 U.S. 626, 630 (2003), citing with approval *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (seizure indicated in circumstances including "the threatening presence of several officers, the

CREIGHTON &ROSE, PC | ATTORNEYS AT LAW

815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

seizure – including the amount of force used – must also be reasonable. *Graham v.
Connor*, 490 US 386, 394-5 (1989); *Tennessee v. Garner,* 471 US 1, 7-8 (1985).  Claims
that officers used excessive force in apprehending a subject and taking him into custody
are analyzed under the Fourth Amendment.

> All claims that law enforcement officers have used excessive force – deadly
> or otherwise – in the course of an arrest must be analyzed under the Fourth
> Amendment and its 'reasonableness' standard. *See  Graham v. Connor*,
> 490 U.S. at 395;  *Ward v. City of San Jose*, 967 F2d 280, 284 (9th Cir 1992)
> (as amended). . . .  That analysis requires balancing the 'nature and quality
> of the intrusion' on a person's liberty with the 'countervailing governmental
> interests at stake' to determine whether the use of force was objectively
> reasonable under the circumstances. *Graham*, 490 US at 396.

> The Supreme Court has said that 'the 'reasonableness' inquiry in an
> excessive force case is an objective one: The question is whether the
> officers' actions are 'objectively reasonable' in light of the facts and
> circumstances confronting them[.]'  *Id.* at 397 (citations omitted); *see, e.g.*,
> *Jackson v. City of Bremerton*, 268 F3d 646, 651 (9th Cir 2001).  'The
> question is not simply whether the force was necessary to accomplish a
> legitimate police objective; it is whether the force used was reasonable in
> light of *all* the relevant circumstances.' *Hammer v. Gross*, 932 F2d at 846.
> (emphasis in original).

> In *Graham*, the Supreme Court indicated that relevant factors in the Fourth
> Amendment reasonableness inquiry include '[1] the severity of the crime at
> issue, [2] whether the suspect poses an immediate threat to the safety of the
> officers or others, and [3] whether he is actively resisting arrest or
> attempting to evade arrest by flight.' 490 US at 396.  The Court did not,
> however, limit the inquiry to those factors.  'Because the test of
> reasonableness under the Fourth Amendment is not capable of precise
> definition or mechanical application,' the reasonableness of a seizure must
> instead be assessed by carefully considering the objective facts and

---

display of a weapon by an officer, some physical touching of the person of the citizen, or the use
of language or tone of voice indicating that compliance with the officer's request might be
compelled."). Plaintiff does not challenge the lawfulness of the seizure itself; the issue is the
manner in which the seizure was effectuated.

CREIGHTON | ATTORNEYS
&ROSE, PC | AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

circumstances that confronted the arresting officers. *Id.* In some cases, for example, the availability of alternative methods of capturing or subduing a suspect may be a factor to consider. *See Chew v. Gates*, 27 F.3d 1432, 1441 n. 5 (9th Cir. 1994).

*Smith v. Hemet*, 394 F.3d 689, 700-1 (9th Cir. 2005).

Viewed in light of the above, the force used against Mr. Harrigan was plainly excessive. Looking initially to the explicit factors identified by the Court in *Graham*, the first is an assessment of the "nature and quality of the intrusion" on Mr. Harrigan's liberty. *Graham*, 490 U.S. at 396. Daniel Harrigan was shot three times at close range with bean bag projectiles, and was mauled by the police dog, which required that the resulting gash in his wounded leg be stapled shut. The intrusion on his liberty is substantial.

*Graham* then directs that the intrusion be balanced against the "countervailing governmental interests at stake." The Court identified three non-exclusive factors relevant to the assessment of that governmental interest.

The "most important" factor has been held to be whether the suspect posed an "immediate threat to the safety of the officers or others." *Graham, id.*; *Smith v. City of Hemet*, 394 F.3d at 702. However, "a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle v. Rutherford*, 272 F.3d at 1281. As the evidence will show, none of the defendants had any objective basis for a reasonable belief or even a suspicion that Harrigan was armed or that he posed an immediate threat to the safety of the officers or of

CREIGHTON & ROSE, PC | ATTORNEYS AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

anyone else. To the extent that the deputies were worried that he might endanger other residents or he might escape, there is simply no factual basis for them to have had that apprehension.

Turning to the other two factors, the offense for which the deputies were arresting Harrigan was two counts of Assault IV, a misdemeanor,[3] for having bitten one caregiver on the finger and having struck another with his fist.[4] While not insignificant, misdemeanor assault is hardly an offense of any particularly heightened level of severity.

Finally, *Graham* requires a consideration of whether Mr. Harrigan was "actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Prior to the use of force, Mr. Harrigan was locked in the day room of a crisis facility. While it is true that he was not responding to the deputies' orders, he was doing nothing other than pacing around in the day room, which does not constitute resisting arrest. *See State v. Oliphant*, 347 Or. 175, 195, 218 P.3d 1281 (2009) (resistance, in the context of resisting arrest, requires that the defendant must have used sufficient physical force to create a "substantial risk of injury."). He was constantly under surveillance and had done nothing that might suggest to the officers that he might attempt flight. Even after the deputies broke down the door of the day room and shouted orders at him, the testimony will be that

---

[3] ORS 163.160

[4] The Resisting Arrest charge stemmed from Mr. Harrigan's response to being assaulted and cannot be used as part of the "severity of the offense" factor, since it occurred after the excessive force was inflicted. In any case Resisting Arrest is also a misdemeanor, and not one of any heightened severity. ORS 162.195.

CREIGHTON & ROSE, PC | ATTORNEYS AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

he posed no threat to the officers, he made no hostile or aggressive moves and he certainly made no attempt to escape.

Thus, it is clear that the primary *Graham* factors militate strongly in favor of the conclusion that the deputies' use of force was excessive. However, as recognized by the court in *Smith*, 394 F.3d at 701, *Graham* did not limit the inquiry to those factors. In addition to the explicit *Graham* factors, "the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed" are also among the considerations. *See Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011).

The Ninth Circuit has addressed the significance of the mental or emotional state of the subject.

> The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense. In the former instance, increasing the use of force may, in some circumstances at least, exacerbate the situation; in the latter, a heightened use of less-than-lethal force will usually be helpful in bringing a dangerous situation to a swift end. In the case of mentally unbalanced persons, the use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis. *See Alexander* [*v. City and County of S.F.*], 29 F.3d [1355] at 1366 [(9th Cir. 1994)] (holding that the police used excessive force, considering all the circumstances, in 'storming the house of a man whom they knew to be a mentally ill ... recluse who had threatened to shoot anybody who entered'). Even when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue

CREIGHTON
&ROSE, PC | ATTORNEYS
AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

him, the governmental interest in using such force is diminished by the fact
that the officers are confronted, not with a person who has committed a
serious crime against others, but with a mentally ill individual.  We do not
adopt a *per se* rule establishing two different classifications of suspects:
mentally disabled persons and serious criminals.  Instead, we emphasize
that where it is or should be apparent to the officers that the individual
involved is emotionally disturbed, that is a factor that must be considered in
determining, under *Graham*, the reasonableness of the force employed.

*Deorle v. Rutherford*, 272 F.3d at1282-3. Notably, "[e]ven when an emotionally disturbed

individual is 'acting out and inviting officers to use [. . .] force,' the governmental interest

in using such force is diminished by the fact that the officers are confronted, not with a

person who has committed a serious crime against others, but with a mentally ill

individual." *Glenn,* 673 F.3d at 876.

Another consideration that has been recognized is the extent to which the deputies

themselves provoked the situation necessitating the use of force. "[P]olice tactic[s] that

needlessly or unreasonably create a dangerous situation necessitating an escalation in the

use of force" are "a course of action this circuit has expressly refused to endorse." *Deorle*,

272 F.3d at 1282 n. 20 (*citing Cunningham v. Gates*, 229 F.3d 1271, 1291 n.23 (9th Cir.

2000)); *Alexander v. City and County of San Francisco*, 29 F.3d 1355, 1366 (9th Cir.

1994).

The facts to be adduced at trial will show that the deputies were all aware that Mr.

Harrigan was autistic, and that he was "acting out." *Glenn*, 673 F.3d at 876. His autism,

developmental disability, emotional lability and cognitive impairment certainly would

warrant his consideration as a mentally disabled person, as contemplated by the court in

CREIGHTON
& ROSE, PC | ATTORNEYS
AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

*Deorle* and *Glenn.* As such, the governmental interest in using force was significantly diminished, especially when Mr. Harrigan was confined in a locked room. Likewise the interest in arresting him in order to take him into custody and bring him to jail was not reasonable given the fact he was *already* in the custody of a crisis facility. The actions of the deputies in breaking down the door and shouting commands at him – commands with which he would have had trouble complying even had he not been in a highly agitated state – needlessly and unreasonably created a more dangerous situation. *Deorle*, 272 F.3d at 1282 n. 20. The evidence will further show that there were no warnings given to Mr. Harrigan prior to the firing of the bean bag rounds and letting slip the dog, and no reason that it was not feasible to have done so. *See Deorle*, 272 F.3d at 1283-4.  Finally, given that Mr. Harrigan was doing nothing other than pacing around, confined in the locked day room, was making no efforts to escape or do anything else, did not have access to any other residents and appeared to be calming down, other alternative and far less intrusive means of controlling Mr. Harrigan were available. The simplest – leaving him alone in the locked room, under constant observation until he deescalated – should have been considered. However, any alternatives to brute force, unfortunately, were either dismissed out of hand or simply not thought of at all. *See Smith*, 394 F3d at 700-1; *Chew*, 27 F.3d at 1441 n. 5.

> 'Force, [even if] less than deadly, is not to be deployed lightly. To put it in terms of the test we apply: the degree of force used by [the police] is permissible only when a strong government interest compels the employment of such force.' *Deorle*, 272 F.3d at 1280 (emphasis added). *See*

CREIGHTON & ROSE, PC | ATTORNEYS AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

*also Headwaters* [*Forest Def.*] *II* [*v. County of Humboldt*], 276 F.3d [1125] at 1130 [(9th Cir. 2002)]("'The essence of the *Graham* objective reasonableness analysis' is that 'the force which is applied must be balanced against the need for that force: it is the need for force which is at the heart of the *Graham* factors.'") *(quoting Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997)).

*Drummond v. City of Anaheim*, 343 F.3d 1052, 1057 (9th Cir. 2003).

When all of the factors identified are considered, in consideration of the totality of the circumstances, the conclusion that defendants' use of force against Mr. Harrigan was excessive is inescapable.

## B.  Second Claim: Battery against Marion County[5]

'A battery is an intentional harmful or offensive contact with another.' *Cook v. Kinzua Pine Mills Co.*, 207 Or. 34, 48-49, 293 P.2d 717 (1956).  To prove a battery, plaintiff must show that 'the conduct which brings about the harm [was] an act of volition on the actor's part, and [that] the actor . . . intended to bring about a harmful or offensive contact or put the other party in apprehension thereof.' *Bakker v. Baza'r, Inc.*, 275 Or. 245, 249, 551 P.2d 1269 (1976).  It is not necessary that the contact cause physical harm if the contact is offensive or insulting. *Id.*

*Jordan vs. City of Eugene*, 2006 U.S. Dist LEXIS 38839 (D. Or. 2006).

In the instant case, when the defendant deputies broke down the door of the day room, and fired bean bag rounds at him, set the dog on him and then took him to the ground, they intentionally came into contact with Mr. Harrigan, with intention of forcing him into submission. That contact injured Mr. Harrigan, and thus was without question offensive to him.

---

[5] The defendant in this state law claim is Marion County. ORS 30.265(1).

CREIGHTON & ROSE, PC | ATTORNEYS AT LAW

815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

There was no justification for the defendant deputies to have initiated the offensive contact with Mr. Harrigan. As a general matter, a police officer is justified in using physical force in apprehending or arresting a subject only when and to the extent that the officer believes that such force is reasonably necessary. *See* ORS 161.235; *Gigler v. City of Klamath Falls*, 21 Or. App. 753, 763, 537 P.2d 121 (1975); *Hatfield v. Gracen*, 279 Or. 303, 567 P.2d 546 (1977); discussion, *ante*. As has been discussed, there is no lawful reason for the deputies to have violently placed Mr. Harrigan under arrest.

### C.   Third Claim: 42 U.S.C Section 1983 Claims – *Monell* Claim against Marion County

Liability of a local governing body under 42 U.S.C. §1983 arises only when "action pursuant to official municipal policy of some nature caused a constitutional tort" and not on the basis of *respondeat superior*. *Monell v. Department of Social Servs.*, 436 U.S. 658, 691 (1978). "The 'official policy' requirement 'was intended to distinguish acts of the municipality from acts of employees of the municipality,' and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur* v. *Cincinnati,* 475 U.S. 469, 479-80 (1986). *See also City of Canton v. Harris,* 489 U.S. 378, 389 (1986).

Municipal policy "need only cause [the] constitutional violation; it need not be unconstitutional *per se*." *Jackson v. Gates,* 975 F.2d 648, 654 (9th Cir. 1992); *see also Collins v. City of Harker Heights, Tex.,* 503 U.S. 115, 122 (1992). Municipal policy "causes" an injury where it is "the moving force" behind the constitutional violation,

CREIGHTON & ROSE, PC | ATTORNEYS AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

*Monell, supra*, at 694, or where "the city itself is the wrongdoer." *Collins, supra,* at 122.

*See Chew v. Gates, et al.*, 99 F.3d 1432, 1444 (9th Cir. 1999).

There are several ways to establish "*Monell* liability." *See Christie v. Iopa*, 176

F.3d 1231, 1235 (9th Cir.1999), *cert. denied*, 528 U.S. 928 (1999). Municipal liability

may be premised on any of the following:

> (1) conduct pursuant to an expressly adopted official policy; (2) a
> longstanding practice or custom which constitutes the 'standard operating
> procedure' of the local government entity; (3) a decision of a
> decision-making official who was, as a matter of state law, a final
> policymaking authority whose edicts or acts may fairly be said to represent
> official policy in the area of decision; or (4) an official with final
> policymaking authority either delegating that authority to, or ratifying the
> decision of, a subordinate.

*Young v. City of Visalia*, 687 F. Supp. 2d 1141, 1147-8 (ED Cal. 2009).

Judge Ishii, in his comprehensive distillation of the law of municipal liability under

§ 1983, *id.*, discussed the contours of a claim of failure to train as an incident of *Monell*

liability. In essence, the claim is that the failure to train amounts to a manifestation of

municipal policy. *See Oviatt v. Pearce, et al.,* 954 F.2d 1470, 1477 (9th Cir. 1992). "the

decision not to take any action to alleviate the problem. . . constitutes a policy for

purposes of 1983 municipal liability."). Thus, a municipality's failure to train its

employees may create § 1983 liability where the

> "failure to train amounts to deliberate indifference to the rights of persons
> with whom the [employees] come into contact." *City of Canton v. Harris*,
> 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989); *Long*, 442
> F.3d at 1186; *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001).
> "The issue is whether the training program is adequate and, if it is not,

CREIGHTON | ATTORNEYS
& ROSE, PC | AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

whether such inadequate training can justifiably be said to represent municipal policy." *Long*, 442 F.3d at 1186. A plaintiff alleging a failure to train claim must show: (1) he was deprived of a constitutional right, (2) the municipality had a training policy that "amounts to deliberate indifference to the [constitutional] rights of the persons' with whom [its police officers] are likely to come into contact;" and (3) his constitutional injury would have been avoided had the municipality properly trained those officers. *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007); *Lee*, 250 F.3d at 681. "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton*, 489 U.S. at 389; *Long v. City & County of Honolulu*, 511 F.3d 901, 907 (9th Cir. 2007). A municipality is "deliberately indifferent" when the need for more or different action, "is so obvious, and the inadequacy [of the current procedure] so likely to result in the violation of constitutional rights, that the policymakers … can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390; *Lee*, 250 F.3d at 682.

*Young*, 687 F. Supp. 2d at 1147.

There are several SOCP homes in Marion County, and in fact, Marion County deputies have been called to the Macleay House several times prior to this incident. Several of the deputies testified to responding to calls at various SOCP group homes, and almost all of them had some knowledge or experience with people with autism. Yet, Marion County has provided deputies with little or no training on how to properly respond to incidents involving individuals with autism at these homes, and deputies are not mandated to participate in crisis intervention training. Moreover, the command staff of the Sheriff's office reviewed this incident and ratified the course of conduct, determining the deputies acted appropriately, and had no concerns about the way the

CREIGHTON & ROSE, PC | ATTORNEYS AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

deputies handled the incident. The only changes made after the incident was to try to ensure Oregon State Police responded to SOCP calls, rather than Marion County deputies.

As the court noted in *Oviatt*, the absence of a policy can constitute a policy for purposes of 1983 municipal liability. The failure to provide training to its deputies about relating to autistic subjects is reflective of just such a policy. *See Henry v. County of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997) ("'post-event evidence' may be used to prove the existence of a municipal policy in effect at the time" of the event").

### D. Fourth Claim: Harrigan's Claims under the ADA and the Rehabilitation Act Against Marion County

The ADA was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title II of the ADA provides:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

To establish a violation of Title II, Mr. Harrigan must show that (1) he is a qualified individual with a disability; (2) he was discriminated against with regard to a public entity's services, programs, or activities, and (3) such discrimination was by reason of his disability. *See Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002), *cert denied*

CREIGHTON & ROSE, PC | ATTORNEYS AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

537 U.S. 1105 (2003); *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002).[6]

### 1.    Harrigan is a Qualified Individual Under the ADA and the Rehab Act

The ADA defines "disability," as "a physical or mental impairment that

substantially limits one or more of the major life activities of such individual; a record of

such an impairment; or being regarded as having such an impairment." 42 U.S.C. §

12102(2).[7] The Rehab Act incorporates the same definition. 29 U.S.C. § 705(9). Daniel

---

[6] The Rehab Act provides similar protections and remedies. *See* Section 504 of the Rehab Act (29 U.S.C. § 701, *et seq.*,), which

> forbids organizations that receive federal funding, including public schools, from discriminating against people with disabilities. 29 U.S.C. § 794(b)(2)(B); *Mark H.* [*v. Lemahieu*], 513 F.3d [922] at 929 [(9th Cir. 2008)]; *Bird v. Lewis & Clark Coll.*, 303 F.3d 1015, 1020 (9th Cir. 2002). Section 504 provides that 'no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.' 29 U.S.C. § 794(a); see also 34 C.F.R. § 104.4. If an organization that receives federal funds violates Rehabilitation Act § 504 intentionally or with deliberate indifference, it may be liable for compensatory damages. *See Mark H.*, 513 F.3d at 930, 938.

*Mark H. v. Lemahieu*, 620 F.3d 1090, 1097 (9th Cir. 2010). As regards the issues herein, there is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act. *See* 42 U.S.C. § 12133 ("The remedies, procedures, and rights set forth in [the Rehabilitation Act] shall be the remedies, procedures, and rights [applicable to ADA claims]."); *Zukle v. Regents of University of California*, 166 F.3d 1041, 1045 (9th Cir. 1999); *Allison v. Department of Corrections*, 94 F.3d 494, 497 (8th Cir.1996)). The primary difference between the statutes is that the ADA applies only to public entities, whereas the Rehab Act proscribes discrimination in all federally-funded programs. *See Lovell,* 303 F3d at 1052.

[7] 28 CFR § 35.104 states "Disability means, with respect to an individual, a physical or mental impairment that substantially limits one or more of the major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment. (1)(i) The phrase physical or mental impairment means—(A) Any physiological disorder or condition . . . affecting one or more of the following body systems: Neurological,

CREIGHTON & ROSE, PC | ATTORNEYS AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

Harrigan suffers from a severe autism spectrum disorder, developmental disabilities, cognitive impairment and seizure disorder. His IQ is below 20, and he is essentially non-verbal. He is entirely unable to care for himself. He is confined to a secure group home with 24-hour caregivers on premises. There can be no serious question that Mr. Harrigan's autism, epilepsy and developmental delays are plainly disabilities within the meaning of the Americans with Disabilities Act (42 U.S.C. §§ 12131-12165), Section 504 of the 1973 Rehab Act (29 U.S.C. § 705(9)).[8]

A "qualified individual," as the term is used in the statute, means an individual with a disability who meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity. 42 U.S.C. § 12131(2); 28 C.F.R. 35.104. As discussed below, the process of being taken into custody under arrest is a "service" to which the ADA applies. There is no question but that Mr. Harrigan is qualified, as the term is used, to participate in that service.

> ### 2. Both The ADA and the Rehab Act Prohibit Public Entities From Discriminating in Providing Benefits, Services, Programs or Activities.

The regulations promulgated by the Attorney General in implementation of Title II indicate that 42 U.S.C. § 12132 "applies to all services, programs, and activities provided

---

musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine . . ."

[8] Defendants admit that Daniel Harrigan is diagnosed as being autistic. Defendants' Answer to Plaintiff's Second Amended Complaint, ¶3, Dkt #24.

CREIGHTON & ROSE, PC | ATTORNEYS AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

PAGE 20 – PLAINTIFF'S TRIAL MEMO

or made available by public entities . . . " 28 C.F.R. § 35.102(a). Moreover, 28 C.F.R. §

35.130 sets forth the applicable prohibitions against discrimination:

> (a) No qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.
> (b)(1) A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability--
> (i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;
> (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;
> (iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others; . . .
> . . .(vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service."[9]

Title II provides protection from a very broad range of discriminatory treatment

based on disability and "appears to include all core functions of government. Among the

most basic of these functions is the lawful exercise of police powers . . ." *Schorr v.*

*Borough of Lemoyne*, 243 F. Supp. 2d 232, 235 (MD Pa. 2003).[10]

---

[9] Department of Justice and commentary accompanying the regulations should be given "controlling weight unless [they are] 'arbitrary, capricious, or manifestly contrary to the statute[.]'" *See Yeskey v. Pennsylvania Dep't of Corrections,* 118 F.3d 168, 171 (3rd Cir. 1997)(citations omitted), aff'd 524 U.S. 206 (1998).

[10] The Rehab Act is similarly broad in its scope. Tracking the provisions of 28 C.F.R. § 35.130(a), it also prohibits denial of "the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. §794(a). "[T]he term

CREIGHTON & ROSE, PC | ATTORNEYS AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

As a remedial statute, the ADA should be "broadly construed to effectuate its purpose, which is to eliminate discrimination against the disabled in all facets of society." *Id.* "Quite simply, the ADA's broad language brings within its scope anything a public entity does." *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001). The provisions of Title II have been interpreted as "all-encompassing" and "without exception," (*id.* at 237), and apply to the treatment of arrestees. *See Thompson*, 295 F.3d at 897 ("the weight of authority on the applicability of the ADA to arrests suggests that a state's substantive decision-making processes in the criminal law context are not immune from the anti-discrimination guarantees of federal statutory law."). Thus, the ADA will apply to an arrest when the officers "failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." *Lum v. County of San Joaquin*, 756 F. Supp. 2d 1243, 1252 (ED Cal. 2010), *reiterated on summary judgment* 2012 U.S. Dist. LEXIS 40372, *24 (ED Cal. 2012).

> Considering the Ninth Circuit's broad interpretation of the ADA, it seems antithetical to established case law to 'carve out' an exception for arrests. Arrests are both subject to the ADA's prohibition against discrimination on the basis of disability and the duty to provide reasonable accommodations during arrests.

756 F. Supp. 2d at 1253. *See Gohier v. Enright*, 186 F.3d 1216, 1221 (10th Cir. 1999) ("[A] broad rule categorically excluding arrests from the scope of Title II ...is not the

---

'program or activity' means all of the operations of" the entity in question. 29 U.S.C. §794(a).

CREIGHTON & ROSE, PC | ATTORNEYS AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

law."); *Gorman v. Bartch*, 152 F.3d 907,  912-13 (8th Cir. 1998) (police transportation of

the arrestee from the scene to the police station is a "service" to which the ADA applies

and the "benefit" the plaintiff sought . . . was to be handled and transported in a safe and

appropriate manner consistent with his disability); *Schorr*, 243 F. Supp. 2d at 239

("executing . . . involuntary commitment warrants and modifying police practices to

accommodate subjects of the warrants are included in 'programs, services, or activities  of

a public entity' under § 12132 of the ADA."). *See also* U.S. Department of Justice ADA

"Commonly Asked Questions about the Americans With Disabilities Act and Law

Enforcement."  *available at* http://www.usdoj.gov/crt/ada/q&a_law.htm. (Title II of the

ADA covers "receiving citizen complaints; . . . providing emergency medical services;

enforcing laws; and other duties.").

Moreover, defendants admit that in responding to the 911 call, they "were

providing services to the public as the phrase is defined by the ADA and the

Rehabilitation Act." *See* Defendants' Answer, ¶ 26.

### 3.    Harrigan was Discriminated Against "By Reason Of" His Disability

The ADA utilizes "a motivating factor" analysis: and examines whether plaintiff's

disability was a "motivating factor" in the alleged discriminatory conduct. *Head v.

Glacier Northwest Inc.,* 413 F.3d 1053, 1065 (9th Cir. 2005).  The ADA prohibits public

entities from subjecting an individual to discrimination by reason of her or his disability.

*See* 42 U.S.C. § 12132.  This prohibition is not "tied directly to the 'services, programs,

CREIGHTON | ATTORNEYS
&ROSE, PC | AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

or activities' of the public entity." *Bledsoe v. Palm Beach County Soil & Water Conservation Dist*, 133 F.3d 816, 821-22 (11th Cir. 1998). The fact that Marion County through its agents treated Mr. Harrigan adversely on the basis of his disability alone is actionable. A subject who had even minimal verbal communication skills, and even minimal comprehension, would never have been treated in that way.

### 4. Defendants failed to accommodate Harrigan's Disability

Title II of the ADA covers a failure to accommodate a disability. 42 U.S.C. § 12182(b)(2)(A)(ii). Here, Defendant Marion County's agents were aware that Mr. Harrigan had a disability and was acting in a way that was consistent with is disability; *i.e.* engaging in repetitive behavior, not responding to multiple unknown people shouting commands, ignoring social cues. Instead of accommodating his disability by finding alternative ways of handling the situation, such as utilizing deescalation methods taught in crisis intervention or hostage negotiation training or even conferring with the staff of Macleay House about how best to manage Mr. Harrigan, the deputies treated him like a criminal who openly defied them, or some kind of rampaging subhuman creature, and battered him into compliance. The deputies' actions did not accommodate his obvious disability, which was, as it happened, completely ignored.

### E. Abuse of a Vulnerable Person Against Marion County

ORS 124.100, *et seq.*, creates a private right of action for vulnerable persons who are subjected to physical abuse. The successful plaintiff in such a case is entitled to, *inter*

CREIGHTON & ROSE, PC | ATTORNEYS AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

*alia*, treble damages and attorney fees.

The Complaint alleges that Daniel Harrigan was a "vulnerable person," as defined in ORS 124.100(e) and that the defendants caused or permitted him to be subjected to physical abuse, as defined in ORS 124.105. The statute creates a private right of action for its violation. The defendant in this state law claim is Marion County. ORS 30.265(1).

## 1.    Vulnerable persons

A "vulnerable person," as is relevant herein, is one who is either an "incapacitated person" (ORS 124.100(e)(C)), or is a "person with a disability who is susceptible to force, threat, duress, coercion, persuasion or physical or emotional injury because of the person's physical or mental impairment." ORS 124.100(e)(D).

An "incapacitated person" is defined in ORS 125.005(5) (via ORS 124.100(1)(C)) as one who labors under a condition in which the

> person's ability to receive and evaluate information effectively or to communicate decisions is impaired to such an extent that the person presently lacks the capacity to meet the essential requirements for the person's physical health or safety. 'Meeting the essential requirements for physical health and safety' means those actions necessary to provide the health care, food, shelter, clothing, personal hygiene and other care without which serious physical injury or illness is likely to occur.

Under ORS 124.100(1)(D), a "person with a disability" is one who has a physical or mental impairment that:

> (A) Is likely to continue without substantial improvement for no fewer than 12 months or to result in death; and
> > (B) Prevents performance of substantially all the ordinary duties of occupations in which an individual not having the

CREIGHTON & ROSE, PC | ATTORNEYS AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

PAGE 25 – PLAINTIFF'S TRIAL MEMO

physical or mental impairment is capable of engaging, having
due regard to the training, experience and circumstances of
the person with the physical or mental impairment.

As described above, should defendants continue to refuse to stipulate to this fact,

the evidence will show that Mr. Harrigan qualifies as a "vulnerable person."

### 2.    Physical abuse

The definition of "physical abuse" in ORS 124.105(1) contains a list of various

actions which, if directed at a vulnerable person, would constitute physical abuse. Of

significance to the present discussion are the following:

"(a) Assault, under the provisions of ORS 163.160, 163.165, 163.175 and 163.185;
and
\* \* \*
"(c) Recklessly endangering another person, under the provisions of ORS

163.195."

Assault in the fourth degree is committed by a person who "intentionally,

knowingly or recklessly causes physical injury to another." ORS 163.160(1)(a).[11]

To establish Recklessly Endangering another person, it must be proved that

defendants recklessly engaged in conduct that created a substantial risk of serious

physical injury to Mr. Harrigan. ORS 163.195.

For the purposes of the physical abuse allegation, some definitions are necessary.

The term "physical injury" means an injury that impairs a person's physical condition or

---

[11] The other statutes cited are increasingly serious felonies, involving more significant
injuries or more dangerous instrumentalities and are limited to the volitional mental states.

CREIGHTON
& ROSE, PC  ATTORNEYS
AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

causes substantial pain. ORS 161.015(7). *See State v. Higgins*, 165 Or. App. 442 (2000).

"Serious physical injury," as is relevant in the present case, includes a physical injury that

either (1) causes serious and protracted disfigurement, or (3) causes protracted

impairment of health, or (4) causes protracted loss or impairment of the function of any

bodily organ. ORS 161.015(8). As discussed in *Deorle*, 272 F.3d at 1277, 1279, the use of

the "bean bag" projectile creates a risk of serious physical injury.[12] Similarly, "a canine is

certainly capable of inflicting serious injury." *Lange v. Derousse*, 2009 U.S. Dist. LEXIS

124659 *10 (WD Wa. 2009), *citing Miller v. Clark County*, 340 F.3d 959 (9th Cir. 2003).

Note that a serious physical injury need not actually have occurred. *See, e.g., State v.

Harbert*, 155 Or. App. 137, 963 P.2d 710 (1998).

Three culpable mental states may be relevant.

"Intentionally" means that a person acts with a conscious objective to cause the

result or to engage in the conduct so described. ORS 161.015(7)

"Knowingly" means that a person acts with an awareness that the conduct of the

person is of a nature so described or that a circumstance so described exists. ORS

161.015(8)

A person acts "recklessly" if that person is aware of and consciously disregards a

substantial and unjustifiable risk that a particular circumstance exists or result will occur.

---

[12] The court in *Deorle* noted that the defendants referred to a similar cloth-cased shot as a "beanbag" round. "That euphemism grossly underrates the dangerousness of this projectile. The round is not some sort of 'hackey-sack.' It is a projectile capable of inflicting serious injury or death, rather than some children's toy." 272 F.3d at 1279 n.13 and accompanying text.

CREIGHTON | ATTORNEYS
&ROSE, PC | AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

The risk must be of such nature and degree that disregarding it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation. ORS 161.015(9).

Finally, a peace officer is justified in using physical force upon another person only when and to the extent that the peace officer reasonably believes it necessary (1) to make an arrest or to prevent the escape of an arrested person; or (2) for self-defense or to defend a third person from what the officer reasonably believes to be the use or imminent use of physical force while making or attempting to make an arrest or while preventing or attempting to prevent an escape. ORS 161.235.

### 3.   Physical abuse of a vulnerable person

The evidence will show that the defendant deputies committed an Assault, as defined, upon Mr. Harrigan, when they intentionally shot him with bean bag projectiles from a gun at close range and set a dog loose to tear open his leg, causing him physical injury. Their use of force against him was unjustified under state law, since it was not used to prevent his escape and it was not necessary for the defense of self or third persons. Prior to his being assaulted by the deputies, Mr. Harrigan had neither used, threatened to imminently use or gave even the slightest hint that he might imminently use physical force, and, as was discussed previously, was not necessary to make an arrest.

By the same token, defendants "recklessly endangered" Mr. Harrigan when they consciously disregarded the risk of serious physical harm to him that was likely to occur

CREIGHTON
& ROSE, PC
ATTORNEYS
AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

when they shot him with bean bag rounds and sicced the dog on him. They also consciously disregarded the risk of serious physical harm to him that was likely to occur when, in planning his arrest, they completely disregarded the fact that Mr. Harrigan was a vulnerable person.

Finally, the evidence will plainly show that Daniel Harrigan was injured as a result of the physical abuse inflicted upon him by defendants.

## IV.    DAMAGES

Plaintiff will present evidence of Mr. Harrigan's physical injuries to his legs caused by the three rounds of impact munitions and canine bites, and medical bills associated with his treatment. Because Daniel Harrigan is unable to testify himself, or even appear at trial, his parents, who are also his guardians, will testify about their perceptions of the harm he suffered after the incident. Likewise, his own drawings and records will demonstrate the emotional harm he suffered due to this incident.

If the jury finds in Mr. Harrigan's favor, it should easily award substantial compensatory damages for the harm he has suffered.

DATED this 19th day of August, 2013.

_/s/ J. Ashlee Albies_
J. Ashlee Albies, OSB # 051846
Michael Rose, OSB # 753221
Of Attorneys for Plaintiffs

CREIGHTON & ROSE, PC | ATTORNEYS AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

PAGE 29 – PLAINTIFF'S TRIAL MEMO